**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
PAUL K. JOSEPH (287057)
*paul@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:   (619) 798-2006
Facsimile:    (480) 247-4553

***Counsel for Plaintiff and the Proposed Class***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| | Case No:_____ |
| VICTOR GUTTMANN, on behalf of himself and all others similarly situated,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br>OLE MEXICAN FOODS, INC.<br><br><div align="center">Defendant.</div> | **COMPLAINT FOR VIOLATIONS OF:**<br><br>**CAL. BUS. & PROF. CODE §§17200** *et seq.*;<br><br>**CAL. BUS. & PROF. CODE §§17500** *et seq.*;<br><br>**CAL. CIV. CODE §§ 1750** *et seq.*; and<br><br>**BREACH OF EXPRESS WARRANTIES**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................1

II.     INTRADISTRICT ASSIGNMENT ........................................................1

III.    NATURE OF THE ACTION ...................................................1

IV.     PARTIES ...................................................................2

V.      NATURE OF TRANS FAT ...........................................................3

   A.   There is a Scientific Consensus That Trans Fat is Extremely Harmful ..........4

   B.   Artificial Trans Fat is so Inherently Dangerous it Has Been Banned by an Increasing Number of American and European Jurisdictions ..................6

   C.   The Artificial Trans Fat in Xtreme Wellness Causes Cardiovascular Disease ................................................................7

   D.   The Artificial Trans Fat in Xtreme Wellness Causes Type-2 Diabetes ........10

   E.   The Artificial Trans Fat in Xtreme Wellness Causes Breast, Prostate, and Colorectal Cancer .......................................................10

   F.   The Artificial Trans Fat in Xtreme Wellness Causes Alzheimer's Disease and Cognitive Decline ...............................................12

   G.   The Artificial Trans Fat in Xtreme Wellness Causes Damage to Vital Organs ...................................................................12

VI.     PLAINTIFF'S PURCHASES OF XTREME WELLNESS .........................13

VII.    SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DECEPTIVE ACTS ...........................................................14

i

VIII.   XTREME WELLNESS UNNECESSARILY CONTAINS PHVO AND ARTIFICIAL TRANS FAT ...................................................................19

IX.   DEFENDANT'S PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW ...................................20

X.        RELIANCE AND INJURY ..............................................................20

XI.        CLASS ACTION ALLEGATIONS...................................................21

XII.        CAUSES OF ACTION...................................................................24

   A.   First Cause of Action....................................................................24

   B.   Second Cause of Action ................................................................27

   C.   Third Cause of Action ...................................................................28

   D.   Fourth Cause of Action .................................................................29

   E.   Fifth Cause of Action ....................................................................30

   F.   Sixth Cause of Action ...................................................................31

XIII.        PRAYER FOR RELIEF .................................................................32

XIV.        JURY DEMAND............................................................................33

XV.   APPENDIX A – CHART OF COMPETING PRODUCTS TO XTREME WELLNESS THAT DO NOT USE PHVO ...........................................34

Plaintiff Victor Guttmann, on behalf of himself, all others similarly situated, and the general public, by and through his undersigned counsel, hereby sues Defendant Ole Mexican Foods, Inc. ("Ole" or "Defendant"), and upon information and belief and investigation of counsel, alleges as follows:

## I.   <u>JURISDICTION AND VENUE</u>

1.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and the costs and because more than two-thirds of the members of the class defined herein reside in states other than the state of which Ole is a resident.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Victor Guttmann resides in this District; Plaintiff Guttmann suffered injuries as a result of Defendant's acts in this District; many of the acts and transactions giving rise to this action occurred in this District; and Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District through the distribution and sale of its products in this District; (2) resides in this District, and (3) is subject to personal jurisdiction in this District.

## II.   <u>INTRADISTRICT ASSIGNMENT</u>

3.     This civil action arises out of the events and omissions of Defendant Ole Mexican Foods, Inc., which occurred in Pleasanton, California, in Alameda County. Pursuant to Civil Local Rule 3-2(c), this action should be assigned to the San Francisco and Oakland Division

## III.   <u>NATURE OF THE ACTION</u>

4.     Ole manufactures, markets, and sells a packaged tortilla containing partially hydrogenated vegetable oil ("PHVO").

5.     Ole's tortilla containing PHVO is the whole wheat variety of its Xtreme Wellness line of tortillas ["Xtreme Wellness"].

6.     PHVO is a food additive banned in many parts of the world due to its artificial trans fat content. Artificial trans fat is a toxic carcinogen for which there are many safe and commercially acceptable substitutes.

7.     Ole uses various marketing methods to falsely represent Xtreme Wellness as healthful and not harmful to the cardiovascular system; however Xtreme Wellness contains dangerous levels of PHVO, and thus trans fat.

8.     Although safe, low-cost, and commercially acceptable alternatives to PHVO exist, including those used in competing brands and even in other Ole products, Ole unfairly elects *not* to use those substitutes in Xtreme Wellness in order to increase profits at the expense of consumer health.

9.     Xtreme Wellness's labeling further violates specific FDA regulations.

10.    Additionally, Defendant misleadingly markets Xtreme Wellness with health claims. This false advertising deceives consumers into purchasing a product that is harmful to their health.

11.    Plaintiff Victor Guttmann repeatedly purchased and consumed Xtreme Wellness during the Class Period defined herein.

12.    This action is brought to remedy Defendant's unlawful conduct. On behalf of the class as defined herein, Plaintiff seeks an order compelling Defendant to, *inter alia*: (1) cease marketing and selling Xtreme Wellness using the false, misleading, deceptive, and unconscionable tactics complained of herein; (2) conduct a corrective advertising campaign; (3) destroy all misleading and deceptive materials and products; (4) award Plaintiff and other Class members restitution, actual damages, and punitive damages to the extent permitted under the law; and (5) pay costs, expenses, and reasonable attorneys' fees.

## IV.     <u>PARTIES</u>

13.    Defendant Ole is a Georgia corporation with its principal place of business in Norcross, GA. Ole owns, manufactures and sells Xtreme Wellness.

14.     Plaintiff Victor Guttmann is a resident of Pleasanton, California who repeatedly purchased Xtreme Wellness for personal and household consumption.

## V.     NATURE OF TRANS FAT

15.     Artificial trans fat is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400˚F in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated vegetable oil, or PHVO, which is the main source of trans fat in the American diet and used in dangerous quantities in Xtreme Wellness.

16.     PHVO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHVO molecules chemically differ from the natural fat molecules in other food products.[2]

17.     Natural fat, except the trace amounts of natural trans fat from ruminant animals, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side on the carbon chain ("cis fat"). Trans fat, however, has double bonds on opposite sides of its carbon chain.



18.     PHVO was initially a "wonder product" attractive to the packaged food

---

[1] See Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2] See Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). See also Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About *Trans* Fat Nutrition Labeling (Update 2006) (2003), *available at* http://www.cfsan.fda.gov/%7Edms/qatrans2.html.

CLASS ACTION COMPLAINT

industry because it combines the low cost of unsaturated cis fat with the flexibility and long shelf life of saturated fat. Like cis fat, PHVO is manufactured from lower-cost legumes,[3] while saturated fat is derived from relatively expensive animal and tropical plant sources.[4] Given its versatility, PHVO was recently used in 40 percent of processed packaged foods.[5] Now, given its toxic properties, few food companies continue to use PHVO. Defendant, however, has decided not to follow its more responsible peers and cease using PHVO, instead placing its profits over the health of people like Plaintiff.

### A.    There is a Scientific Consensus That Trans Fat is Extremely Harmful

19.    PHVO causes cardiovascular heart disease, diabetes, cancer, Alzheimer's disease, and accelerates cognitive decline in diabetics.

20.    There is "no safe level" of artificial trans fat intake.[6]

21.    In addition, "trans fatty acids are not essential and provide no known benefit to human health."[7] Thus, while "the [Institute of Medicine] sets tolerable upper intake levels (UL) for the highest level of daily nutrient intake that is likely to pose no risk of adverse health effects to almost all individuals in the general population[,] . . . the IOM does **not** set a UL for trans fatty acid because **any** incremental increase in trans fatty acid intake increases the risk of CHD."[8].

22.    Dariush Mozaffarian of Harvard Medical School writes in the New England Journal of Medicine:

> [T]rans fats from partially hydrogenated oils have no intrinsic health

---

[3] e.g., corn oil, soybean oil, peanut oil

[4] e.g., butter, cream, tallow, coconut oil

[5] Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's Trans Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. Chron., Jan. 30, 2002.

[6] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

[7] 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[8] *Id.* (emphasis added).

4

value above their caloric value. Thus from a nutritional standpoint, the consumption of trans fatty acids results in considerable potential harm but no apparent benefit. . . . Thus, complete or near-complete avoidance of industrially produced trans fat—a consumption of less than 0.5 percent of the total energy intake—may be necessary to avoid adverse effects and would be prudent to minimize health risks.[9]

23.     Today there is no question about the scientific consensus on trans fat. Dr. Julie Louise Gerberding, former director of the Center for Disease Control, writes:

The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium. The strong evidence of harm motivated the Institute of Medicine to issue recommendations that the intake of trans fats be minimized and prompted the [FDA] to require the addition of information about trans fat content to food labels beginning in 2006. Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[10]

24.     Doctor Mozaffarian further writes:

---

[9] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601, 1608-09 (2006).

[10] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-38 (2009)

Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention. Furthermore, trans fats from partially hydrogenated oils have no intrinsic health value above their caloric value. Thus, from a nutritional standpoint, the consumption of trans fatty acids results in considerable potential harm but no apparent benefit.[11]

25.    Given its nature as an artificial chemical not naturally found in any food and the considerable harm that it causes to human health, Dr. Walter Willett, Professor of Medicine at Harvard Medical School, finds the most direct analogue of trans fat to be not any natural fat but contaminants such as pesticides. He states that the addition of artificial trans fat to food by companies like Ole "is a food safety issue . . . this is actually contamination."[12]

**B.    Artificial Trans Fat is so Inherently Dangerous it Has Been Banned by an Increasing Number of American and European Jurisdictions**

26.    In 2008, California became the first state to ban all restaurant food with artificial trans fat, a law affecting approximately 88,000 eating establishments. Trans fats now may not be served in California's schools or restaurants in an amount greater than half a gram per serving.[13]

---

[11] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601 (2006).

[12] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

[13] Cal. Educ. Code § 49431.7; Cal. Health & Saf. Code § 114377.

CLASS ACTION COMPLAINT

27.    New York City banned trans fat in its 20,000 food establishments in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

28.    A 2004 Danish law restricted all foods to under 2 percent of fat calories from artificial trans fat. Switzerland made the same restriction in 2008.[14]

29.    After conducting a surveillance study of Denmark's trans fat ban, researchers concluded the change "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[15]

30.    Similar bans have been introduced in Austria and Switzerland. Brazil, Argentina, Chile, and South Africa have all taken steps to reduce or eliminate trans fats from food.[16]

31.    In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines and spreads and 5 percent for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.[17]

**C.     The Artificial Trans Fat in Xtreme Wellness Causes Cardiovascular Disease**

32.    Trans fat raises the risk of CHD more than any other known nutritive product.[18]

33.    Removing trans fat equivalent to 2% of total calories from the American

---

[14] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[15] Mozaffarian, 354 New Eng. J. Med. at 1610; *see also* Stender, Steen, *High Levels of Industrially Produced Trans* Fat in Popular Fast Food, 354 NEW ENG. J. MED. 1650, 1652 (2006).

[16] Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

[17] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm.

[18] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

---

CLASS ACTION COMPLAINT

diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[19]

34.   "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat."[20]

35.   By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including low flow-mediated vasodilation, coronary artery disease, and primary cardiac arrest.

36.   In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[21]

37.   The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[22]

38.   After a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

> [B]ased on the consistent results across a number of the most persuasive
> types of study designs (i.e., intervention trials and prospective cohort
> studies) that were conducted using a range of test conditions and across
> different geographical regions and populations . . . the available

---

[19] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999).

[20] Mozaffarian, 354 NEW ENG. J. MED. at 1611.

[21] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[22] Am. Heart Ass'n., *Trans Fat Overview*, *available at* http://www.heart.org/HEARTORG/GettingHealthy/FatsAndOils/Fats101/Trans-Fats_UCM_301120_Article.jsp.

CLASS ACTION COMPLAINT

evidence for an adverse relationship between trans fat intake and CHD risk is strong.[23]

39.    The FDA further found "[t]o date, there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]."[24] Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD."[25]

40.    A study investigating the impact of trans fatty acids on heart health provides evidence that:

> [E]ven the lower estimates from the effects [of PHVO] on blood lipids would suggest that more than 30,000 deaths per year may be due to the consumption of partially hydrogenated vegetable fat. Furthermore, the number of attributable cases of nonfatal coronary heart disease will be even larger.[26]

41.    By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-selected control patients and comparing the top fifth with the bottom fifth of participants by trans fat intake, another study published in the American Heart Association's Circulation found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.[27]

42.    Australian researchers observed that heart attack patients possess elevated

---

[23] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About *Trans* Fat Nutrition Labeling.

[24] 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[25] *Id.*

[26] W.C. Willett et al.*, Trans Fatty Acids: Are the Effects only Marginal?* 84 AM. J. PUB. HEALTH 722, 723 (1994).

[27] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

CLASS ACTION COMPLAINT

amounts of trans fat in their adipose tissue, strongly linking heart disease with long-term consumption of trans fat.[28]

**D.    The Artificial Trans Fat in Xtreme Wellness Causes Type-2 Diabetes**

43.    Artificial trans fat causes type-2 diabetes.[29]

44.    In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

45.    Researchers at Northwestern University's medical school found mice show multiple markers of type-2 diabetes after eating a high trans fat diet for only four weeks.[30]

46.    By the eighth week of the study, mice fed the diet high in trans fat showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress artificial trans fat places on the body.[31]

47.    A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[32]

**E.    The Artificial Trans Fat in Xtreme Wellness Causes Breast, Prostate, and Colorectal Cancer**

---

[28] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. NUTR. 874, 874-79 (2004).

[29] Am. Heart Ass'n., *Trans Fat Overview*.

[30] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[31] *Id.*

[32] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

CLASS ACTION COMPLAINT

48.   Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

49.   A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[33]

50.   In a 25-year study of 14,916 U.S. physicians, the doctors in the highest quintile of trans fat intake had more than double the risk of developing prostate cancer than the doctors in the lowest quintile.[34]

51.   A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[35]

52.   A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[36]

53.   A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[37]

---

[33] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study.* 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

[34] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[35] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[36] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 Am. J. of Epidemiology 289, 294 (2008).

[37] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

CLASS ACTION COMPLAINT

**F.    The Artificial Trans Fat in Xtreme Wellness Causes Alzheimer's Disease and Cognitive Decline**

54.    Trans fat causes Alzheimer's Disease and cognitive decline.

55.    In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of… trans-unsaturated fats."[38]

56.    The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat."[39]

57.    In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . . trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[40]

58.    The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type-2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes."[41] (citations omitted).

**G.    The Artificial Trans Fat in Xtreme Wellness Causes Damage to Vital Organs**

59.    Artificial trans fat damages vital organs, including the heart, by causing chronic systemic inflammation, where the immune system becomes persistently

---

[38] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-199 (2003).

[39] *Id.*

[40] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

[41] *Id.*

CLASS ACTION COMPLAINT

1   overactive, damages cells, and causes organ dysfunction.[42]

2         **VI.**    **PLAINTIFF'S PURCHASES OF XTREME WELLNESS**

3       60.    Plaintiff Victor Guttmann repeatedly purchased Xtreme Wellness during

4   the Class Period defined herein.

5       61.    Mr. Guttmann purchased approximately one package of Xtreme Wellness

6   per month over the last two years.

7       62.    The most frequent of Mr. Guttmann's purchases of Xtreme Wellness were

8   at the Raley's located at 5420 Sunol Blvd, Pleasanton, CA 94566.

9       63.    Plaintiff first discovered Defendant's unlawful acts described herein in

10  September 2014, when he learned that Xtreme Wellness contained artificial trans fat,

11  and caused heart disease, diabetes, cancer, and death.

12      64.    Plaintiff, in the exercise of reasonable diligence, could not have discovered

13  earlier Defendant's unlawful acts described herein because the dangers of Xtreme

14  Wellness were known to Defendant, but not to him, throughout the Class Period defined

15  herein. Plaintiff is not a nutritionist, food expert, or food scientist, but rather a lay

16  consumer who did not have the specialized knowledge that Defendant had. Even today

17  the nature and extensive utilization of artificial trans fats—including that they

18  necessarily exist where partially hydrogenated oil is used an ingredient in a food

19  product—is generally unknown to the average consumer.

20      65.    When purchasing Xtreme Wellness during the Class Period, Plaintiff read

21  and relied on various health and wellness claims appearing on its packaging (as further

22

23  [42] *See* Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation

24  and Endothelial Dysfunction,* 135 J. NUTR. 562  (2005); *see also* Baer et al., *Dietary fatty acids affect

25  plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study,* 79 AM. J. CLIN. NUTR. 969 (2004); Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk

26  factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils,* 63 Euro. J. CLIN. NUTR. 22 (2009); Mozaffarian et al., *Trans Fatty acids and systemic

27  inflammation in heart failure* 80 AM. J. CLIN. NUTR. 1521 (2004).

28

CLASS ACTION COMPLAINT

described herein), which individually and especially in the context of its packaging as a whole, misleadingly implied that Xtreme Wellness is healthy. Plaintiff would not have purchased Xtreme Wellness absent these advertisements.

66.    Because Plaintiff expected these statements to be true and honest when they are in fact false and misleading, he did not receive the benefit of his purchases. Instead of receiving the benefit of a product free of trans fat, he received a product that contained trans fat.

**VII.    SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DECEPTIVE ACTS**

67.    During the Class Period, Xtreme Wellness was made with PHVO yet contained deceptive health and wellness claims.

68.    The current front and back label of Xtreme Wellness are as follows:




CLASS ACTION COMPLAINT



69. **Misleading "Xtreme Wellness" claims:** During the Class Period, Defendant marketed Xtreme Wellness with the words "Xtreme Wellness."

70. This language was part of an intentional campaign to deceptively market Xtreme Wellness as healthful.

71. Defendant's conduct is especially egregious because tortillas, a classic Mexican-American staple, normally contain no artificial trans fat and do not pose the serious health consequences associated with Xtreme Wellness.

72. **Misleading "Healthy Life Style" claim:** During the Class Period,

15

Defendant marketed Xtreme Wellness with the words "Healthy Life Style" in large flowing script across the top of the package.

73.   This language was part of an intentional campaign to deceptively market Xtreme Wellness as healthful.

74.   **Misleading "Better Choice for Your Health" claim:** During the Class Period, Defendant marketed Xtreme Wellness with the phrase "A Better Choice For Your Health" in large flowing script above the product title.

75.   This language was part of an intentional campaign to deceptively market Xtreme Wellness as healthful.

76.   **Misleading "Whole Wheat" claim:** The packaging of Xtreme Wellness contains the claim, "Whole Wheat" in large font, with a bright yellow multi-point star behind it.

77.   This representation, individually as well as in the context of the packaging as a whole, misleadingly implies Xtreme Wellness is a healthy choice for consumers despite containing artificial trans fat, a toxic additive that causes heart disease, cancer, and type-2 diabetes.

78.   Further, Xtreme Wellness is not made solely with whole wheat flour, but rather a combination of whole wheat and highly refined bleached flour, which lacks the same health benefits of whole wheat flour.

79.   **Misleading "High Source of Fiber and Protein" Claim:** During the Class Period, Defendant marketed Xtreme Wellness with the claim "High Source of Fiber and Protein."

80.   This language was part of an intentional campaign to deceptively market Xtreme Wellness as healthful.

81.   This representation, individually as well as in the context of the packaging as a whole, misleadingly implies Xtreme Wellness is a healthy choice for consumers despite containing artificial trans fat, a toxic additive that causes heart disease, cancer, and type-2 diabetes.

CLASS ACTION COMPLAINT

82.     Further, to use a "High" claim on a food product the food must contain "20 percent or more of the RDI or the DRV per reference amount customarily consumed." 21 C.F.R. §101.54(b). Xtreme Wellness contains only 8% DRV of Protein, and is therefore in direct violation of the law.

83.     **Misleading "Healthy Heart" claim & image:** During the Class Period, Defendant labels the front of Xtreme Wellness "Healthy Heart Lifestyle" and provides a prominent image of a heart.

84.     This claim is misleading because the product is made with PHVO, which harms the heart by raising LDL cholesterol relative to HDL cholesterol levels, and which Defendant deceptively omits.

85.     In order to use health claims like "Healthy Heart Lifestyle," or heart graphics, such claims must be made in connection with a health claim authorized under either Subpart E of title 21 of the Code of Federal Regulations, or 21 U.S.C. § 343(r)(3)(C). *See* 21 C.F.R. § 101.14. Thus, in order to use the challenged "Healthy Heart Lifestyle" advertisements and graphics, two conditions must be met: First, the claim to which the "Healthy Heart Lifestyle" advertisement is connected must meet the requirements of 21 U.S.C. § 343(r)(3)(C). Second, the "Heart Healthy Lifestyle" advertisement must meet the requirements of 21 C.F.R. § 101.14. Defendant's "Healthy Heart Lifestyle" advertisements on Xtreme Wellness fail in this respect for several reasons.

86.     First, the claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(ii)(III) because the label fails to present "a balanced representation of the scientific literature relating to the relationship between a nutrient and a disease or health-related condition to which the claim refers."

87.     Second, the claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(iii) because the claim is not in compliance with 21 U.S.C. § 343(r)(3)(A)(ii), which provides that a claim of this type may only be made if Xtreme Wellness "does not contain, as determined by the Secretary by regulation, any nutrient in an amount which

17

increases to persons in the general population the risk of a disease or health-related condition which is diet-related . . . ."

88.   Third, the claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(iii) because it is not "otherwise in compliance with [21 U.S.C. § 343](a)," which prohibits representations that are "false or misleading in any particular."

89.   Fourth, the claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(iii) because it is not "otherwise in compliance with . . . section 201(n)," which provides:

> If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representation or material with respect to consequences which may result from the use of the article to which the labeling or advertising related under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

21 U.S.C. § 321(n).

90.   Fifth, the claim does not meet the requirements of 21 U.S.C. § 343(r)(3)(C)(iv), because it is not stated in a manner such that the claim is an accurate representation of the authoritative statement on which it relies.

91.   Sixth, the "Healthy Heart Lifestyle" advertisements and heart graphics on the front violates 21 C.F.R. § 101.14(d)(2)(iii), which requires any such claim to be "complete, truthful, and not misleading." For the reasons discussed in this Complaint, the artificial trans fat in Xtreme Wellness renders the claim that the product contributes to a "Healthy Heart Lifestyle" incomplete, untruthful, and misleading.

92.   Seventh, the heart graphic also violates 21 C.F.R. § 101.14(d)(2)(iv) because

it includes prohibited intervening material.

93.   Eighth, Defendant's "Healthy Heart Lifestyle" advertisements on Xtreme Wellness also violate 21 C.F.R. § 101.14(d)(2)(v), because the claim does not enable the public to comprehend the information provided and to understand the relevant significance of such information in the context of a total daily diet, where Defendant misleadingly omits the offsetting effect of the trans fat in the product on the effect claimed.

94.   **Misleading characterization of "Trans Fat Free":** The packaging of Xtreme Wellness contains the claim "Trans Fat Free." However, because Xtreme Wellness contains PHVO, it necessarily contains trans fat. It is further an unauthorized nutrient content claim.

95.   In light of the harmful effects of even small amounts of trans fat on human health, this claim is both false and highly misleading, in part because the statement, by its appearance alongside the FDA-mandated ingredient list, implies endorsement by the FDA under the FDCA, which is false.

## VIII.   XTREME WELLNESS UNNECESSARILY CONTAINS PHVO AND ARTIFICIAL TRANS FAT

96.   Defendant's use of PHVO in Xtreme Wellness is unnecessary. There are several safe substitutes for PHVO and artificial trans fat. In fact, Defendant manufactures and distributes other tortilla products with alternative formulations that do not contain artificial trans fat. For example, Defendant manufactures and sells an "Xtreme Wellness Multi Grain Tortilla," which contains no PHVOs.

97.   Similarly, several manufacturers of competing tortilla products have responsibly decided to refrain from adding artificial trans fat to their products. Such brands sold in the United States include Mission, Guerrero, Kroger, Calidad, La Banderita, and Canasta including specific varieties is identified in Appendix A hereto.

98.   Although alternative formulations and substitutes for PHVO were and are available, Defendant elects not to use them in Xtreme Wellness in order to increase its

19

profits.

## IX.   DEFENDANT'S PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW

99.   Defendant's practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because its conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of the conduct to Defendant does not outweigh the gravity of the harm to Defendant's victims.

100.   In particular, while Defendant's use of PHVO in Xtreme Wellness may have some utility in that it allows Defendant to realize higher profit margins than if it used certain safe natural fats, or processed fats not containing trans fat, this utility is small and far outweighed by the gravity of the serious health harm imposed upon consumers.

101.   Defendant's conduct injures competing manufacturers of tortillas that do not engage in its unfair, immoral behavior, especially given the limited shelf space in retailers packaged food sections.

102.   Defendant's actions also violate public policy by causing the United States, California, and every other state to pay—via Medicare, Medicaid, Veterans Health Administration and other programs—for treatment of trans fat-related illnesses.

103.   Further, the injury to consumers from Defendant's practices is substantial, not outweighed by benefits to consumers or competition, and is not one consumers themselves could reasonably have avoided.

## X.   RELIANCE AND INJURY

104.   When purchasing Xtreme Wellness, Plaintiff was seeking a product of particular qualities, including a product that did not negatively affect blood cholesterol levels or the health of his cardiovascular system, and a product made with natural, healthy ingredients.

105.   Plaintiff read and relied on, for his Xtreme Wellness purchases, the product's packaging and the health and wellness message it conveyed, which was a

1  substantial factor in each of his purchases.

2      106.   Specifically, Plaintiff relied on statements that Xtreme Wellness was

3  "Healthy" and promoted "Wellness" and a "Healthy Life Style."

4      107.   Plaintiff was further injured by Defendant's omission of information that

5  would have been important to his purchasing decision.

6      108.   Plaintiff purchased Xtreme Wellness believing it had the qualities he sought

7  based on the product's deceptive labeling, but the product was actually unsatisfactory to

8  him for the reasons described herein.

9      109.   Xtreme Wellness costs more than similar products without the misleading

10  labeling, and would have cost less, for example demanded less in the marketplace, absent

11  Defendant's false and misleading statements and material omissions. Thus, Xtreme

12  Wellness is worth less than what Plaintiff paid for it.

13      110.   Plaintiff would not have purchased Xtreme Wellness absent Defendant's

14  misrepresentations.

15      111.   Plaintiff purchased Xtreme Wellness instead of competing products based on

16  the false statements and misrepresentations described herein.

17      112.   Plaintiff lost money as a result of Defendant's unlawful behavior. Plaintiff

18  altered his position to his detriment and suffered loss in an amount equal to the amount he

19  paid for Xtreme Wellness.

20                          **XI.   CLASS ACTION ALLEGATIONS**

21      113.   Plaintiff brings this action on behalf of himself and all others similarly

22  situated (the "Class"), excluding Defendant's officers, directors, and employees, and the

23  Court, its officers and their families, as follows:

24          All persons who purchased in the United States, on or after November 1,

25          2011, for household or personal use, tortillas in packaging containing the

26          words "Xtreme Wellness" manufactured or distributed by Ole Mexican

27          Foods, Inc. and containing partially hydrogenated vegetable oil.

28      114.   Questions of law and fact common to Plaintiff and the Class include:

CLASS ACTION COMPLAINT

a.   Whether Defendant communicated a health and wellness message through Xtreme Wellness's packaging;

b.   Whether that message was material, or likely to be material, to a reasonable consumer;

c.   Whether that message was false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

d.   Whether Defendant fraudulently omitted material information in advertising Xtreme Wellness as healthy;

e.   Whether Defendant fraudulently omitted material information in advertising Xtreme Wellness;

f.   Whether the class is entitled to actual damages, restitution, rescission, punitive damages, attorneys' fees and costs, injunctive, and/or any other relief;

g.   Whether Defendant's conduct constitutes violations of the California's False Advertising Law;

h.   Whether Defendant's conduct was immoral, unscrupulous, or offensive of public policy because Defendant advertised Xtreme Wellness to people deliberately seeking a healthy option despite knowing of the dangers from its artificial trans fat content;

i.   Whether Defendant's conduct constitutes a violation of the California Consumer Legal Remedies Act;

j.   Whether Defendant's conduct constitutes a violation of the unlawful prong of California's Unfair Competition Law;

115.   By purchasing and/or using Xtreme Wellness, all Class members were subjected to the same wrongful conduct.

CLASS ACTION COMPLAINT

116.   Absent Defendant's material deceptions, misstatements, and omissions, Plaintiff and other Class members would not have purchased Xtreme Wellness.

117.   Plaintiff's claims are typical of the Class' claims. Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

118.   The Class is sufficiently numerous, as it includes thousands of individuals who purchased Xtreme Wellness throughout the United States during the Class Period.

119.   Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as three or four dollars for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

120.   Defendant has acted on grounds applicable to the Class, thereby making final injunctive relief or declaratory relief appropriate concerning the Class as a whole.

121.   Questions of law and fact common to the Class predominate over any questions affecting only individual members.

122.   Class treatment is appropriate under Fed. R. Civ. P. 23(a) and both Fed. R. Civ. P. 23(b)(2) and 23(b)(3). Plaintiff does not contemplate class notice if the class is certified under Fed. R. Civ. P. 23(b)(2), which does not require notice. Plaintiff contemplates notice via publication if the class is certified under Fed. R. Civ. P. 23(b)(3) or if the Court determines class notice is required notwithstanding that notice is not required under Fed. R. Civ. P. 23(b)(2). Plaintiff will, if notice is required, confer with Defendant and seek to present the Court with a stipulation and proposed order on the details of a class notice plan.

///

///

///

///

CLASS ACTION COMPLAINT

## XII.    CAUSES OF ACTION

### A. First Cause of Action

### California Unfair Competition Law, Unlawful Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

123.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

124.   Defendant has made and distributed, in interstate commerce and in this District, products that make false or misleading statements of fact regarding its content. Xtreme Wellness was placed into interstate commerce by Defendant and sold throughout the country and in this District.

125.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

126.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unlawful" business acts and practices in that Defendant's conduct violates the California False Advertising Law, and the California Consumer Legal Remedies Act, as alleged herein.

127.   Defendant's conduct is further "unlawful" because it violates § 43(a) the Lanham Act, 15 U.S.C. § 1125(a), in that Defendant's advertising constitutes false statements of fact in interstate commerce about its own and other products, which were material in that they were likely to influence consumers' purchasing decisions, and which had a tendency to deceive, or actually deceived a substantial segment of Defendant's audience, resulting in injury.

128.   Defendant's conduct is further "unlawful" because it violates the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, (1) 21 U.S.C. § 343(a), which deems food misbranded when the label contains a statement that is "false or misleading in any particular," (2) 21 C.F.R. § 101.13(i)(3), which bars nutrient content claims voluntarily placed on the front of a product label that are "false or misleading in any respect," (3) 21 C.F.R. § 101.54(b), which bars the use of the claim "high" without "20

percent or more of the RDI or the DRV per reference amount," (4) 21 C.F.R. § 101.14 requiring claims to be "complete, truthful, and not misleading," and which "enables to public to comprehend the information" and (5) 21 U.S.C. § 343(r)(3)(C) requiring claims to present "a balanced representation of the scientific literature relating to the relationship between a nutrient and a disease or health-related condition to which the claim refers," be "stated in a manner so that the claim is an accurate representation of the authoritative statement," be in compliance with "section 201(n)", and the product "not [to] contain . . . any nutrient in an amount which increases to persons in the general population the risk of a disease or health-related condition which is diet-related."

129.    Defendant further violates the FDCA's implementing regulation, 21 C.F.R. § 1.21, because Xtreme Wellness's packaging fails to reveal material facts, namely the dangers of PHVO described in detail herein, "in light of other representations," namely the specific statements described herein as misleading.

130.    Defendant's conduct further violates The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular," and Health & Safety Code § 110670, which bars nutrient content claims voluntarily placed on the front of a product label that fail to comply with the federal regulation for nutrient content claims (i.e., "may not be false or misleading in any respect"). Defendant's conduct also violates the following sections of the Sherman Law:

- § 110100 (adopting all FDA regulations as state regulations);

- § 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.");

- § 110390 ("It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any

particular.");

• <u>§ 110395</u> ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

• <u>§ 110398</u> ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

• <u>§ 110400</u> ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .");

• <u>§ 110670</u> ("Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto.");

• <u>§ 110680</u> ("Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).");

• <u>§ 110705</u> ("Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.");

• <u>§ 110760</u> ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");

• <u>§ 110765</u> ("It is unlawful for any person to misbrand any food."); and

• <u>§ 110770</u> ("It is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.").

131.   All of the challenged labeling statements made by Defendant thus constitute violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

132.   Defendant leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

133.   Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he decided to purchase Xtreme Wellness over competing products that are less expensive and/or contain no artificial trans fat.

134.   Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would not have purchased Xtreme Wellness.

135.   Defendant's deceptive advertising allowed it to sell more units of Xtreme Wellness than it would have otherwise, and at a higher price.

136.   In accordance with Cal. Bus. & Prof Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

137.   Plaintiff also seeks an order for the restitution of all monies from the sale of Xtreme Wellness which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

138.   Plaintiff also seeks an order for the disgorgement and restitution of all monies from the sale of Xtreme Wellness, which were acquired through acts of unfair competition.

## B.   Second Cause of Action

### California Unfair Competition Law, Fraudulent Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

139.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

140.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

141.   Defendant leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

142.   Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he

decided to purchase Xtreme Wellness over competing products, which are less expensive and/or contain no artificial trans fat.

143.   Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would not have purchased Xtreme Wellness.

144.   Defendant's deceptive advertising allowed it to sell more units of Xtreme Wellness, and at a higher price.

145.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "fraudulent" business acts and practices in that Defendant's conduct has a likelihood, capacity or tendency to deceive Plaintiff, the Classes, and the general public.

146.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

147.   Plaintiff further seeks an order for the restitution of all monies from the sale of Xtreme Wellness which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

## C.   Third Cause of Action

### California Unfair Competition Law, Unfair Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

148.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

149.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

150.   Defendant leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

151.   Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he

decided to purchase Xtreme Wellness over competing products, which are less expensive and/or contain no artificial trans fat.

152.   Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would not have purchased Xtreme Wellness.

153.   Defendant's deceptive advertising allowed it to sell more units of Xtreme Wellness, and at a higher price.

154.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unfair" business acts and practices because Defendant's conduct is:

       a.    immoral, unethical, unscrupulous, and offends public policy;

       b.    the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct; and

       c.    the injury to consumers caused by Defendant's conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

155.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

156.   Plaintiff further seeks an order for the restitution of all monies from the sale of Xtreme Wellness which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

### D.      Fourth Cause of Action

### California False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500 *et seq.*

157.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

158.   In violation of Cal. Bus. & Prof. Code §§ 17500 *et seq.*, the advertisements,

labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of Xtreme Wellness without the knowledge that they contained toxic artificial trans fat.

159.   Defendant knew and/or reasonably should have known that the labels on Xtreme Wellness were untrue and/or misleading.

160.   As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

### E.   <u>Fifth Cause of Action</u>

### California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750 *et seq.*

161.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

162.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

163.   Defendant's policies, acts and practices were designed to, and did, result in the purchase and use of Xtreme Wellness primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

     a.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

     b.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

     c.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

     d.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

164.   As a result, Plaintiff and the Class have suffered irreparable harm and are entitled to injunctive relief and restitution.

165.   As a further result, Plaintiff and the Class have suffered damages, and because the conduct was deliberate, immoral, oppressive, made with malice and/or contrary to public policy, they are entitled to punitive or exemplary damages.

166.   In compliance with Civ. Code § 1782, Plaintiff sent Defendant written notice of his claims on September 25, 2014.

167.   Pursuant to section 1782 *et seq.* of the CLRA, Plaintiff notified Defendant in writing by certified mail of the particular violations of § 1770 of the Act as to Xtreme Wellness and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act. Defendant's wrongful business practices regarding Xtreme Wellness constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that Xtreme Wellness has characteristics, uses, benefits, and abilities which are false and misleading, and have injured Plaintiff and the Class.

168.   Defendant received Plaintiff's written notice on September 30, 2014, and responded on October 27, 2014, refusing to "acquiesce to the demands made."

## F.   Sixth Cause of Action

### Breach of Express Warranty

169.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

170.   During the class period, Defendant made written representations to the public, including Plaintiff, by its advertising and packaging that Xtreme Wellness is "Healthy," "A Better Choice for Your Health," part of a "Healthy Life Style" and a "Healthy Heart Lifestyle," and is "Trans Fat Free."

171.   These promises and related promises printed on the label became part of the basis of the bargain between the parties and thus constituted an express warranty.

172. Thereon, Defendant sold the goods to Plaintiff and other consumers who bought the goods from Defendant.

173. However, Defendant breached this express warranty in that Xtreme Wellness is not "Healthy," "A Better Choice for Your Health," or part of a "Healthy Life Style" or a "Healthy Heart Lifestyle" because it contains PHVO, a toxic substance known to increase the risk of coronary heart disease, cancer, Alzheimer's disease, type-2 diabetes, stroke, and other ailments.

174. Further, Defendant breached its express warranty in that it claims Xtreme Wellness is "Trans Fat Free" when in reality, it contains PHVO which means it necessarily contains trans fat.

175. As a result of this breach, Plaintiff and other consumers in fact did not receive goods as warranted by Defendant.

176. As a proximate result of this breach of warranty by Defendant, Plaintiff and other consumers have been damaged in an amount to be determined at trial.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, all others similarly situated, and the general public, prays for judgment against Defendant as follows:

A.   An order confirming that this class action is properly maintainable as a nationwide class action as defined above, appointing Plaintiff Victor Guttmann and his undersigned counsel to represent the Class, and requiring Defendant to bear the cost of class notice;

B.   An order requiring Defendant to pay damages to Plaintiff and class members so that they may be restored any money which may have been acquired by means of any unfair, deceptive, unconscionable, fraudulent, or negligent action, in the amount of $5 million, or such greater amount to be determined at trial;

C.   An order requiring Defendant to disgorge any benefits received from Plaintiff and/or unjust enrichment realized as a result of its improper and

32

1   misleading advertising and marketing of Xtreme Wellness;

2   D.   An award of punitive damages to the extent allowable by law and

3   referenced in the Complaint, in an amount to be proven at trial;

4   E.   An order requiring Defendant to cease and desist its deceptive,

5   unconscionable and fraudulent practices;

6   F.   An order requiring Defendant to engage in a corrective advertising

7   campaign;

8   G.   An award of prejudgment and post judgment interest;

9   H.   An award of attorneys' fees and costs; and

10   I.   Such other and further relief as this Court may deem just, equitable or

11   proper.

12   **XIV.**   **JURY DEMAND**

13   Plaintiff demands a trial by jury on his claims for damages.

14   DATED: October 31, 2014   Respectfully Submitted,

15

16   /s/ Gregory S. Weston____

16   **THE WESTON FIRM**

17   GREGORY S. WESTON

17   MELANIE PERSINGER

18   PAUL K. JOSEPH

18   1405 Morena Blvd., Suite 201

19   San Diego, CA 92110

20   Telephone:  (619) 798-2006

21   Facsimile:  (480) 247-4553

21   ***Counsel for Plaintiff and the***

22   ***Proposed Class***

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## XV.    Appendix A

### Chart of Competing Products to Xtreme Wellness

### That Do Not Use PHVO

Mission Tortillas distributed by Mission Foods including all of the following varieties:

- Flour Soft Taco
- Flour Burrito
- Flour Fajita
- White Corn
- Yellow Corn
- Soft Taco Carb Balance
- Burrito Carb Balance Whole Wheat
- Fajita Carb Balance Whole Wheat
- Artisan Corn Wheat Blend
- Artisan Multi-Grain
- Artisan Flaxseed Blue Corn Blend
- Garden Spinach Wrap
- Sun Dried Tomato Wrap
- Jalapeño Cheddar Wrap
- Life Balance Wheat Soft Taco
- Multi-Grain Flour Soft Taco

Guerrero Tortillas distributed by Gruma Corporation including all of the following varieties:

- Flour
- Homemade Flour Fajita
- Whole-wheat Flour
- Corn
- Flour Soft Taco
- Frequi-Ricas Flour

Kroger Tortillas manufactured by The Kroger Company including all of the following varieties:

- Flour Burrito Size
- 100% Whole Wheat Soft Taco Size

Calidad Brand distributed by Gruma including all of the following varieties:

- Corn Tortillas

34

La Banderita distributed by Ole Mexican Foods, Inc. including all of the following varieties:

- Corn Tortillas
- Large Flour Soft Taco
- Extra Large Flour Tortillas

La Tortilla Factory distributed by La Tortilla Factory including all of the following varieties:

- Low Carb Whole Wheat
- Hand Made Style Corn Tortillas

Canasta Uncooked Flour Tortillas distributed by Canasta including all of the following variety:

- Uncooked Flour Tortillas

CLASS ACTION COMPLAINT